IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

PAULA M. STACY,

   Plaintiff,

v.          CASE NO. 2:10-cv-01057

MICHAEL J. ASTRUE,
Commissioner of Social Security,

   Defendant.


**M E M O R A N D U M   O P I N I O N**

  This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's application for Supplemental Security Income ("SSI"), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Both parties have consented in writing to a decision by the United States Magistrate Judge and filed briefs in support of judgment on the pleadings.[1]

  Plaintiff, Paula M. Stacy (hereinafter referred to as "Claimant"), protectively filed an application for SSI on August 21, 2007, alleging disability as of August 13, 2007, due to breast cancer, anxiety attacks, nerves, headaches. (Tr. at 173-76, 193, 250.) The claim was denied initially and upon reconsideration. (Tr. at 96-100, 106-08.) On June 9, 2008, Claimant requested a

---

[1] The court reminds the parties that pursuant to Local Rule of Civil Procedure 9.4(a), the parties need not file briefs in support of "judgment on the pleadings." Instead, Plaintiff should file "a brief in support of the complaint," while Defendant files "a brief in support of the defendant's decision." Local Rules of the United States District Court for the Southern District of West Virginia, Local Rule of Civil Procedure 9.4(a).

hearing before an Administrative Law Judge ("ALJ"). (Tr. at 109-11.) The hearing was held on March 3, 2009, before the Honorable Theodore Burock. (Tr. at 75-93.) A supplemental hearing was held on September 3, 2009. (Tr. at 25-74.) By decision dated September 22, 2009, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-24.) The ALJ's decision became the final decision of the Commissioner on June 18, 2010, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4.) On August 30, 2010, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920 (2009). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently

2

engaged in substantial gainful employment.  Id. § 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. § 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2009).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

     In this particular case, the ALJ determined that Claimant

satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 13.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of obesity, bladder incontinence and chronic diffuse pain. (Tr. at 13.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 17.) The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 17.) Claimant has no past relevant work. (Tr. at 22.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as price marker, sorter/inspector, and handpacker, which exist in significant numbers in the national economy. (Tr. at 23.) On this basis, benefits were denied. (Tr. at 24.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

4

Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)).
Additionally, the Commissioner, not the court, is charged with
resolving conflicts in the evidence.  Hays v.Sullivan, 907 F.2d
1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not
abdicate their traditional functions; they cannot escape their duty
to scrutinize the record as a whole to determine whether the
conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d
396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the
Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was forty-three years old at the time of the first
administrative hearing.  (Tr. at 80.) Claimant completed the ninth
grade.  (Tr. at 82.)  She has no past relevant work.  (Tr. at 22.)

The Medical Record

The court has reviewed all evidence of record, including the
medical evidence of record, and will summarize it briefly below.

In August of 2007, Claimant was diagnosed with breast cancer
and underwent a left breast mastectomy and was to undergo adjuvant
chemotherapy.  (Tr. at 272-73.)  On April 1, 2008, Fred T. Pulido,
Jr., M.D. performed left breast reconstruction with placement of a
submuscular tissue expander.  (Tr. at 314-15.)  On December 28,
2008, Claimant underwent right breast mammoplasty with nipple and
areolar transposition.  (Tr. at 611-12.)  On September 16, 2008,

she underwent placement of a tissue expander with a gel implant and reconstruction of the capsule with allograft (neoform dermis) on the left breast.  (Tr. at 619.)  On May 4, 2009, Claimant underwent surgery for creation of a left nipple.  (Tr. at 683.)  Claimant was prescribed Tamoxifen for five years.  (Tr. at 624-625.)

On January 2, 2008, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work, with an occasional ability to climb ladders, ropes and scaffolds.  (Tr. at 285-92.)

On February 4, 2008, and February 12, 2008, Michelle Akers, M.A. of Psychological Associates of Logan, Inc. examined Claimant at the request of her counsel. Claimant reported that breast cancer had destroyed her nerves.  On the WAIS-III, Claimant attained a verbal IQ score of 60, a performance IQ score of 63 and a full scale IQ score of 58.  Ms. Akers opined that the scores were externally invalid.  (Tr. at 296.)  Ms. Akers diagnosed major depressive disorder, single episode, severe on Axis I and deferred an Axis II diagnosis.  She rated Claimant's GAF at 45-50.[2]  (Tr. at 297.)

On February 12, 2008, Ms. Akers completed a Medical Assessment of (Mental) Ability to do Work-Related Activities and opined that

---

[2]  A GAF of 41-50 is defined as "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. (Text Revision) 1994).

Claimant's abilities were fair to poor in all categories.  (Tr. at 299-302.)

On February 15, 2008, S.C. Bhanot, M.D. examined Claimant related to complaints of stress and urge incontinence.  Claimant's complaints started when she began chemotherapy.  He diagnosed 1B cystocele and stress and urge incontinence.  He recommended further testing.  (Tr. at 304.)  On February 26, 2008, Dr. Bhanot examined Claimant.  His diagnosis and plan remained the same.  (Tr. at 305.)

On March 31, 2008, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work, with occasional postural limitations, a need to avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation and hazards, and a need to avoid concentrated exposure to extreme cold and heat and humidity.  (Tr. at 306-13.)

On April 8, 2008, Elizabeth Durham, M.A. examined Claimant at the request of the State disability determination service.  Ms. Durham diagnosed major depressive disorder, single episode, moderate, anxiety disorder, not otherwise specified on Axis I.  She made no Axis II diagnosis.  (Tr. at 321.)

On May 2, 2008, a State agency medical source completed a Psychiatric Review Technique form and opined that Claimant's mental impairments were not severe.  (Tr. at 323-36.)

The record includes treatment notes from Process Strategies

dated April 14, 2008, through August 13, 2008.  On April 14, 2008,
William Hall, P.A. conducted a psychosocial assessment/intake.  Mr.
Hall diagnosed major depressive disorder and anxiety disorder, not
otherwise specified on Axis I and dependent personality traits on
Axis II.  He rated Claimant's GAF at 49.  He prescribed Xanax,
Cymbalta and Zolpidem and referred Claimant for individual therapy.
(Tr. at 381.)  The record includes treatment notes from Mr. Hall
dated May 12, 2008, June 16, 2008, July 15, 2008, and August 13,
2008.  The treatment notes and assessment appear to be authored by
Mr. Hall, but are also signed by Jeffrey Priddy, M.D.  (Tr. at 367-
81.)  On May 12, 2008, Claimant reported minimal benefit from the
Zolpidem.  She had an increase in general anxiety and agitation in
her activities of daily living.  Claimant had a modest improvement
in her depression.  He increased Cymbalta.  (Tr. at 373.)  On June
16, 2008, Claimant was complaining of difficulty sleeping and
having mood swings.  He noted a history of bipolar disorder in
Claimant's half siblings.  (Tr. at 371.)  On July 15, 2008, Mr.
Hall changed Claimant's diagnosis to bipolar disorder, not
otherwise specified and anxiety disorder, not otherwise specified.
Claimant was sleeping well with Seroquel.  She had decreased
agitation but was still dysthymic.  She had significant pain relief
with Cymbalta.  He noted Claimant's cancer was in remission.  Mr.
Hall noted that Claimant had improved with medication.  (Tr. at
370.)  On August 13, 2008, Claimant reported mild dysthymia.  Mr.

8

Hall noted improvement with medication.  (Tr. at 367-68.)

On September 20, 2008, Mr. Hall and Dr. Priddy of Process Strategies completed a Medical Assessment of (Mental) Ability to do Work-Related Activities on which they opined that Claimant's abilities were fair to poor in most categories.  (Tr. at 387-90.)

Claimant underwent a hysterectomy on October 27, 2008.  (Tr. at 393-96.)

On March 5, 2008, Safique Ahmed, M.D., who treated Claimant for her breast cancer, completed a questionnaire on which he opined that Claimant cannot lift more than 10 pounds, that she must lie down at unpredictable intervals throughout the day, that she should avoid standing on hard surfaces, that she should never climb, balance, stoop, crouch, kneel or crawl and that she should avoid pushing or pulling with her hands, arms, legs and feet.  He also opined that Claimant has limitations in gross and fine manipulation up to two thirds of the day and that she would need rest periods from gross/fine manipulation.  He opined that Claimant cannot work a full eight-hour day.  (Tr. at 410-11.)

The record includes an additional treatment note from Mr. Hall, also signed by Dr. Priddy dated October 23, 2008.  Mr. Hall diagnosed bipolar disorder, not otherwise specified and anxiety disorder, not otherwise specified.  Claimant was downcast due to her medical problems.  Claimant was improved with medication.  (Tr. at 606-07.)

9

On March 30, 2009, Roger C. Baisas, M.D. conducted a consultative examination. It appears this was done at the request of the State disability determination service. (Tr. at 47.) He diagnosed primary breast cancer, central, bipolar affective disorder, manic, incontinence urinary bladder, muscle weakness and obesity. (Tr. at 628.)

Dr. Baisas completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) and opined that Claimant could not lift or carry anything, that she could sit for fifteen minutes at a time, stand for ten minutes at a time, walk for ten minutes at a time, sit for one hour at a time, stand for one hour at a time and walk for forty-five minutes at a time. Claimant requires use of a cane to ambulate. Claimant can never push/pull and can only occasionally reach, handle, finger and feel, she can never operate feet controls, climb stairs and ramps, ladders or scaffolds, balance, stoop, crouch or crawl, and she should never be exposed to unprotected heights, moving mechanical parts, operating a motor vehicle, extreme cold or extreme heat. Finally, Claimant cannot shop, travel without a companion, walk a block at a reasonable pace, prepare a simple meal or sort, handle or use paper/files. (Tr. at 632-37.)

On April 3, 2009, Dr. Bhanot recommended that Claimant undergo transobturatur tape and cystocele repair to address her stress urinary incontinence. Claimant was willing to undergo this

procedure.  (Tr. at 640.)

On April 8, 2009, Claimant presented to Joby Joseph, M.D. with complaints of numbness and tingling, clumsiness, difficulty with initiating movement, gait disturbance and generalized weakness. Dr. Joseph's impression was polyneuropathy in malignant disease. He ordered needle electromyography and nerve conduction studies. (Tr. at 655.)

The record includes additional treatment notes from Mr. Hall, also signed by Dr. Priddy dated January 28, 2009, and April 29, 2009.  (Tr. at 658-61.)  On January 28, 2009, Claimant was downcast about her medical problems.  She had recently had a complete hysterectomy and breast surgery.  Mr. Hall noted she was improved with medication.  (Tr. at 660-61.)  On April 29, 2009, Mr. Hall noted that Claimant had mild dysphoria with multiple and severe general health problems and significant domestic stressors.  He noted that Claimant improved with medication.  (Tr. at 658-59.)

Upon testing by Dr. Joseph, Claimant had mild prolongation of the distal sensory latencies of the Sural nerve which may indicate sensory neuropathy.  There was no EMG evidence of radiculopathy. (Tr. at 664.)

On May 21, 2009, Claimant complained of chest pain and was to proceed with heart catheterization.  (Tr. at 668.)  Heart catheterization showed no significant coronary artery disease. (Tr. at 669.)

11

On July 29, 2009, Dr. Bhanot noted that Claimant's transobturatur tape was cancelled because of changes on her EKG, but that she had since been cleared for surgery.

At the second administrative hearing, Dr. Judith Brendemuehl and Dr. Mary Buban testified. (Tr. at 38-67.) Dr. Brendemuehl testified that Claimant had breast cancer in the left breast, with successful reconstruction and successful completion of chemotherapy with sensory neuropathy as a probable residual from the chemotherapy. Claimant also has stress incontinence and urge incontinence, is on medication that has helped and is scheduled for surgery. (Tr. at 40.) She testified that Claimant does not meet or equal a listing. (Tr. at 41.) She placed Claimant in the light to medium exertional level and testified that postural limitations included avoiding things like ladders, ropes and scaffolds, hazards and machinery because of the sensory neuropathy. (Tr. at 42.) Dr. Brendemuehl testified that she did not have a clear cut picture regarding Claimant's fibromyalgia, and suspected Claimant's musculoskeletal pain was related to Claimant's medication. (Tr. at 41.) Dr. Brendemuehl did not believe that Claimant had a significant physical limitation. (Tr. at 48.)

Dr. Buban testified that Claimant had a major depressive disorder, bipolar disorder and anxiety disorder. (Tr. at 50, 53.) Dr. Buban testified that it was reasonable for someone with breast cancer to experience depression and anxiety, but it appears that

12

Claimant's depression/anxiety was more significant than would be predicted from the outcome of her actual treatment, which was described as very good. (Tr. at 52-53.) Dr. Buban wondered what limitations Claimant might have due to the number of different medications she takes.

Dr. Buban initially testified that her concern was Claimant's "stress tolerance based on her testimony and how the record reads and whether she would actually be able to maintain a 40-hour workweek." (Tr. at 53.) She based this concern on the diagnoses and assessment completed by Mr. Hall. (Tr. at 53-54.) She testified that she did not see the same level of restriction in the consultative examination completed by Ms. Durham. Dr. Buban did not find much support for the diagnosis of bipolar disorder by Mr. Hall. Dr. Buban initially suggested a consultative examination to resolve any inconsistency between the examinations by Ms. Durham and Ms. Adkins. Upon questioning from the ALJ, Dr. Buban conceded that Mr. Hall's treating record does not support his change in diagnosis to bipolar disorder and that Mr. Hall did no objective testing. (Tr. at 55.) The question of whether there were additional treatment notes that were not part of the record was raised, and the ALJ states "[t]hat's a good question," but the rest of his response is inaudible. (Tr. at 57.)

When asked specifically by the ALJ if she was suggesting another consultative examination to resolve any inconsistency

between Ms. Durham's report and the examination performed by Ms. Akers, Dr. Buban stated that "I offered that for your consideration because my [INAUDIBLE] the clinical notes do not answer the question of why there was such significant inconsistencies between those two consultative exams." (Tr. at 65.) The ALJ then asked if Mr. Hall's treatment notes come closer to the Claimant's performance on the consultative examination by Ms. Durham, and Dr. Buban responded in the affirmative. She stated "[i]f I just look at the objective [INAUDIBLE] mental status exam his initial assessment is more in agreement with the second consultative exam." (Tr. at 65.) Dr. Buban agreed that Ms. Akers' examination was performed closer in time to when Claimant was being treated for breast cancer and that is was "entirely possible" that she performed better as treatment took effect, though again, portions of Dr. Buban's response are inaudible. (Tr. at 65.) Finally, Dr. Buban further noted that in fact, Mr. Hall's treatment notes show improvement over time with medication and treatment. (Tr. at 66.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ erred in failing to find Claimant's breast cancer, sensory neuropathy and psychiatric problems to be severe; (2) the ALJ failed to reconcile his opinion with the vocational expert's opinion; and (3) the ALJ failed to properly develop the record. (Pl.'s Br. at 7-12.)

14

The Commissioner argues that (1) Claimant's resolved breast cancer, alleged neuropathy and alleged psychological conditions did not prevent her from working; (2) the ALJ posed a reasonable hypothetical question to the vocational expert; and (3) Claimant never requested a subpoena for Dr. Kenari's records.  (Def.'s Br. at 12-20.)

Claimant first argues that the ALJ erred in failing to find her breast cancer, sensory neuropathy and psychiatric problems to be severe.  Claimant suggests that while her cancer problems may have now subsided, she is left with neuropathy and, at a minimum, deserves a closed period of disability from August of 2007, through May of 2009 (the date of the EMG demonstrating neuropathy).  (Pl.'s Br. at 7-11.)  The court notes that during this period, Claimant underwent six surgeries, plus chemotherapy, and was scheduled for a seventh surgery.

A severe impairment is one "which significantly limits your physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(c)(2009); see also 20 C.F.R. § 416.921(a)(2009); Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (recognizing change in severity standard).  "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 416.921(b)(2009).  Examples of basic work activities are:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and

speaking;
    (3) Understanding, carrying out, and remembering simple instructions;
    (4) Use of judgment;
    (5) Responding appropriately to supervision, co-workers and usual work situations; and
    (6) Dealing with changes in a routine work setting.

Id.

When evaluating a claimant's mental impairments, the Social Security Administration uses a special sequential analysis outlined at 20 C.F.R. § 416.920a (2009). First, symptoms, signs, and laboratory findings are evaluated to determine whether a claimant has a medically determinable mental impairment. § 416.920a(b)(1). Second, if the ALJ determines that an impairment(s) exists, the ALJ must specify in his/her decision the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s). § 416.920a(b)(1) and (e). Third, the ALJ then must rate the degree of functional limitation resulting from the impairment(s). § 416.920a(b)(2). Functional limitation is rated with respect to four broad areas (activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation). § 416.920a(c)(3). The first three areas are rated on a five-point scale: None, mild, moderate, marked, and extreme. The fourth area is rated on a four-point scale: None, one or two, three, four or more. § 416.920a(c)(4). A rating of "none" or "mild" in the first three areas, and a rating

of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise.  § 416.920a(d)(1).  Fourth, if a mental impairment is "severe," the ALJ will determine if it meets or is equivalent in severity to a mental disorder listed in Appendix 1. § 416.920a(d)(2).  Fifth, if a mental impairment is "severe" but does not meet the criteria in the Listings, the ALJ will assess the claimant's residual functional capacity.  § 416.920a(d)(3).  The ALJ incorporates the findings derived from the analysis in the ALJ's decision:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).  The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

§ 416.920a(e)(2).

Regarding the ALJ's duty to develop the record, in Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986).  The court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Id.  The court explained that the ALJ's failure to ask further questions and to demand the production

17

of further evidence about the claimant's arthritis claim, in order to determine if it met the requirements in the listings of impairments, amounted to a neglect of his duty to develop the evidence.  Id.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that he or she is disabled.  20 C.F.R. § 416.912(a) (2009).  Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he or she has an impairment.  Id. § 416.912(c).  In Bowen v. Yuckert, the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings.  It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step.  The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . .  If the process ends at step two, the burden of proof never shifts to the Secretary.  . . .  It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as plaintiff's counsel.  Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994).  Claimant bears the burden of establishing a prima facie entitlement to benefits.  See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A.

18

§ 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  Similarly, he or she "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

The court finds that the ALJ's decision that Claimant does not have a severe mental impairment is not supported by substantial evidence.  Furthermore, the evidence of record related to Claimant's mental impairments is inadequate and in need of further development.  At the outset, the court was significantly hindered in its review by the inaudible portions of Dr. Buban's hearing testimony.  Clearly, there were technical glitches at the hearing that made meaningful testimony difficult to obtain and even more difficult to review.  There are few portions of Dr. Buban's testimony that do not contain some inaudible portion.

Nevertheless, what is clear from Dr. Buban's testimony is that she believed further development of the record was necessary because of the inconsistencies in the evidence of record from Ms. Akers, Mr. Hall and Ms. Durham.  Dr. Buban explains: "Because there's such a dramatic difference between the exam that was performed at the request of her attorney [presumably Ms. Akers] and the exam that was performed by [INAUDIBLE] [presumably Ms. Durham] if we did another consultative exam, included the IQ and

achievement that would at least give us a third piece of data with
which to determine the level of severity because I don't have any
objective data in those treating notes and not a lot of explanation
to why the limits [INAUDIBLE]. *** [T]here's really not a clear
rationale why he changed the diagnosis to bipolar." (Tr. at 55.)

Later she states: "There are different findings among the
three different sources.   Independent exam that was done
[INAUDIBLE], the consultative examiner and then the treating
source.  Yes, three different [INAUDIBLE] levels noted." (Tr. at
59.)

Indeed, Ms. Akers examined Claimant first at her counsel's
request in February of 2008, six months after her breast cancer
diagnosis, and conducted objective testing (WAIS-III and WRAT-III),
the results of which were deemed externally invalid due to
emotionality.  She diagnosed major depressive disorder, single
episode, severe, rated Claimant's GAF at 45-50 and completed a
Medical Assessment of (Mental) Ability to do Work-Related
Activities containing significant limitations. (Tr. at 293-98,
299-302.)

On April 8, 2008, Ms. Durham examined Claimant at the request
of the State disability determination service and diagnosed major
depressive disorder, single episode, moderate, anxiety disorder,
not otherwise specified. (Tr. at 321.)  She administered no
objective psychological tests.

Mr. Hall, who was an "other source"[3] under the regulations, as the ALJ points out (though Dr. Priddy also signed off on all of Mr. Hall's treatment notes), treated Claimant over an extended period (from April of 2008, through April of 2009) for depression, anxiety and eventually bipolar disorder.  On September 20, 2008, Mr. Hall and Dr. Priddy completed a Medical Assessment of (Mental) Ability to do Work-Related Activities on which they opined that Claimant's abilities were fair to poor in most categories.  (Tr. at 387-90.) Mr. Hall administered no objective psychological testing.  As indicated at the hearing, it is unclear whether there are other treatment notes or what additional role Dr. Priddy may have played in Claimant's treatment.

In any event, the record is inadequate as it relates to Claimant's mental impairments.  The little objective testing that occurred, done by Ms. Akers, was deemed externally invalid.  Ms. Durham conducted no objective testing, nor did Mr. Hall.  Both Ms. Akers and Mr. Hall/Dr. Priddy found significant mental limitations. While the ALJ attempts to reconcile the inadequacies pointed out by Dr. Buban by asserting that Ms. Durham's findings and Mr. Hall's treatment notes are consistent and resolve any conflict between Ms. Durham's report and Ms. Aker's report, this does not resolve the

---

[3]   Under the regulations, acceptable "medical sources" include licensed physicians and psychologists, among others, while "other sources" include physicians' assistants like Mr. Hall.  The Commissioner "*may* ...use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work."  20 C.F.R. §§ 404.1513(d) and 416.913(d) (2009) (emphasis added).

21

point initially raised by Dr. Buban. Dr. Buban's testimony reflects that she believed that there were inconsistencies between the reports of Ms. Akers and Ms. Durham and that objective testing was necessary to determine the level of severity of Claimant's mental impairment and whether there is objective evidence to support Mr. Hall's opinions. In light of the testimony of Dr. Buban, the largely inaudible hearing tape, the fact that questions remain about whether there are additional treatment notes from Dr. Priddy and from Dr. Kanuri (who apparently diagnosed Claimant's fibromyalgia) this court must conclude that the record in this matter is inadequate and in need of further development. In particular, a consultative mental examination including psychological testing is in order to resolve the conflict raised by Dr. Buban.

The court need not reach the remaining arguments raised by Claimant.

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is not supported by substantial evidence. Accordingly, by Judgment Order entered this day, this matter is REVERSED and REMANDED for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g) and this matter is DISMISSED from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: July 22, 2011

Mary E. Stanley
United States Magistrate Judge